UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

In re:

Mary E. Machado and                                          Case No. 22-11030-KHK
John C. Machado                                              Chapter 13

Debtors.

<u>**MEMORANDUM OPINION**</u>

This matter was before the Court on March 16, 2023, for a hearing on the Confirmation of the Debtors' Amended Chapter 13 Plan[1] and the Chapter 13 Trustee's Objection thereto.[2]  The Debtors, Counsel for the Debtors and the Trustee attended the hearing and presented argument and evidence in support of their positions.  Having heard the arguments of counsel and the evidence, the Court will deny confirmation of the current plan without leave to amend, and therefore, will dismiss this case. The Court makes the following findings of fact and conclusions of law.

**Findings of Fact**

Mary E. Machado and John C. Machado (the "Debtors") filed this joint chapter 13 case on August 8, 2022.[3]  The Debtors filed their first Chapter 13 Plan on the same day.[4]  The first plan was denied confirmation on October 6, 2022, based on the Objection to Confirmation filed by JPMorgan Chase Bank, National Association, the Debtors' mortgage lender.[5]  The Debtors filed an amended plan on October 11, 2022,[6] drawing an Objection to Confirmation[7] from the Trustee, which was heard on November 17, 2022 along with the Trustee's Motion to Dismiss.[8]  At that hearing, the Court denied the Motion to Dismiss and sustained the Trustee's Objection to Confirmation of the second plan.[9]  The Debtors filed their third plan

---

[1] Doc. No. 46.
[2] Doc. No. 48.
[3] Doc. No. 1.
[4] Doc. No. 2.
[5] Doc. No. 13 (JPMorgan Objection); Doc. No. 18 (Order Denying Confirmation).
[6] Doc. No. 20.
[7] Doc. No. 23.
[8] Doc. No. 15.
[9] Doc. No. 35 (Order Denying Motion to Dismiss); Doc. No. 31 (Order Denying Confirmation of Second Plan).

on December 5, 2022, which was again denied confirmation at a hearing held on January 19, 2023.[10]  On

February 10, 2023, the Debtors filed the current plan hereinafter referred to as (the "Plan").[11]

The Plan provides for monthly payments of $2,000 for the first six months, then $2,300 for the

remaining fifty-four months, for total funding of $136,200.  This Plan proposes a 73% distribution to

non-priority unsecured creditors.  Section 3A includes $3,000 in attorney's fees to be paid through the

Plan as an administrative expense.  In addition to including $29,354 owed to the IRS for taxes, Section

3B also provides for the payment of $3,000 in legal fees to be paid as a priority claim.  Claim Number

4 filed by the IRS indicates that the Debtors jointly owe $30,541.21 in total, of which $29,354 is

priority debt.[12]  Through the Plan, the Debtors also propose to cure mortgage arrearages owed to

JPMorgan Chase in the amount of $2,809.[13]

According to the Debtors' schedules, they own real property located at 836 Anthony Court SE,

Leesburg, VA 20175 (the "Property").[14]  The schedules indicate the Property is held as tenants by the

entirety, meaning it is exempt from creditor claims unless such claims are joint-debts of both Debtors.[15]

The Property's scheduled value is $900,000.[16]  The Debtors' schedules indicate a monthly net income of

$2,323.33.[17]  The Court notes that Schedule J indicates a $100 expense for "Supporting mom," and indicates

that the Debtors have two dependents living with them - the Debtors' son and Mr. Machado's mother.[18]

The Debtors' Schedule E/F includes a debt to Upstart for $16,979 and indicates the account was

opened in June of 2022.[19]  The Court notes that Upstart Network, Inc. filed Claim 1 for $17,205.97 five

---

[10] Doc. No. 39; Doc. No. 41 (Order denying confirmation of third plan).
[11] Doc. No. 46.
[12] Proof of Claim No. 4.
[13] Doc. No. 46, p. 4.
[14] Doc. No. 1, p. 10 (Schedule A/B).
[15] See Doc. No. 1, p. 16, Schedule C.
[16] See Doc. No. 1, p. 10, Schedule A/B.
[17] Doc. No. 46, p. 4.
[18] *See* Transcript 29:11-13; 32:13-15.
[19] Doc. No. 1, p.29.

days after this case was filed.[20]  The attachment to the proof of claim indicates the account was opened on June 13, 2022, and that the date of the last transaction was also June 13, 2022.[21]

The Debtors' Statement of Financial Affairs (SOFA) indicates they withdrew the following amounts from a 401K account prior to the petition date:  $30,000 in 2022, $120,000 in 2021 and $160,000 in 2020.[22]  The Debtors claim that the $30,000 withdrawal constituted a "one-time retirement account withdrawal."[23]  Their tax returns show that in tax-year 2022, in addition to the $30,000 401K withdrawal, they made an additional 401K withdrawal of $23,379.[24]  The Debtors' means test, in particular Form 122C-1, does not include the $30,000 withdrawal on Line 9, but instead indicates $0.

Ms. Machado testified during the hearing that the 401K withdrawals were made because the Debtors were "still struggling a bit."[25]  She acknowledged that the approximately $23,000 withdrawal was made between August and December of 2022.[26]  She also testified that she made an additional withdrawal of approximately $6,000 since January of 2023.[27]  Mr. Machado testified that he withdrew an additional $2,000 from his 401K in February of 2023.[28]  Under redirect examination Ms. Machado admitted she had $30 remaining in her 401K and Mr. Machado admitted he had $6,000 remaining in his 401K account.[29]

In the Debtors' means test, they have claimed a household size of four, which corresponds to a $121,793 median family income for a family of that size in Virginia, making the Debtors "above median" debtors, resulting in a five-year commitment period for their plan.

Prior to filing this case, on or about February 19, 2022, the Debtors traded in a 2017 Chevy Tahoe that was owned free and clear in order to finance and purchase a 2022 Chevy Tahoe worth $75,000.[30]  The

---

[20] Proof of Claim 1.
[21] Id. at 4.
[22] Doc. No. 50.
[23] Doc. No. 49, p.3.
[24] *See* Doc. No. 50, p. 2. (the "2022 Tax Returns").
[25] Transcript 20:11-12.
[26] Transcript 28:6-10.
[27] Transcript 23:16-25; 33:12-17.
[28] Transcript 35:13-17.
[29] Transcript 33:20-34-1, 34:19-21.
[30] Doc. No. 1, p. 42 (SOFA), p. 11 (Schedule A/B).

monthly payment for the 2022 Tahoe is $528.21 per month.[31] The Debtors testified at the hearing that they bought the new vehicle because it was a good deal and because they wanted to avoid maintenance costs going forward.[32] The Debtors paid their legal fees and the filing fee for this case in part by charging those fees on a credit card. Claim 5 was filed by JPMorgan Chase Bank, N.A., the credit card lender.[33] Supporting documents attached to the Proof of Claim indicate the charge was made on June 30, 2023, and the total charged for the fees was $2,313.[34] The Debtors propose to compromise that claim through the Plan.

**Conclusions of Law**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).

The Trustee has objected to confirmation of the Plan under section 1325(a)(3) for lack of good faith, under section 1325(a)(4) for the liquidation test, under 1325(a)(6) for feasibility and under section 1325(b)(1)(B) for disposable income.

Because the primary thrust of the Trustee's objection is the alleged bad faith on the part of the Debtors, the Court begins by noting that the Bankruptcy Code requires debtors to file their chapter 13 plan in good faith. *In re Asamoah*, No. 21-11888-BFK, 2022 WL 952484, at *6 (Bankr. E.D. Va. Mar. 29, 2022); *In re Brandland*, 570 B.R. 203, 217 (Bankr. E.D. Va. 2017). The Fourth Circuit held in *Deans v. O'Donnell*, that "[b]roadly speaking, the basic inquiry [with respect to good faith] should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [Chapter 13] in the proposal or plan[.]" 692 F.2d 968, 972 (4th Cir. 1982) (quoting 9 Collier on Bankruptcy ¶ 9.20, at 319 (14th ed. 1978)). In assessing plans for good faith, the Fourth Circuit applies the following non-exhaustive list of factors:

---

[31] Doc. No. 28, p. 20.
[32] Transcript 36:6; 38:16-17.
[33] Proof of Claim 5.
[34] Id. at 7.

not only the percentage of proposed repayment, but also the debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor.

*Id*.   The good faith inquiry is ultimately determined by examining the totality of the circumstances on a

case-by-case basis.  *Id*. at 972.

The Court will address each issue raised by the Trustee in turn.

The Trustee first takes issue with the Debtors essentially double counting their legal fees by including them in both sections 3A and 3B of the Plan.  Consistent with the inclusion of such debts in section 3B of the Plan, the Debtors have also deducted such fees in the means test analysis.  The Debtors, citing to *In re Dumas*, 608 B.R. 902 (Bankr. N.D. Ga. 2019) respond that the legal fees are properly treated as priority debt, asserting that such treatment is allowed by the Code and the caselaw.  The bankruptcy court in that case held that an above-median chapter 13 debtor should deduct his or her actual attorney fees before calculating the minimum amount to be paid to nonpriority unsecured creditors under the plan.  *In re Dumas*, 608 B.R. 902, 921 (Bankr. N.D. Ga. 2019).  While the *Dumas* court found that the Code permits a debtor to include attorney's fees as priority claims, it also expressly noted that double-counting through use of a pot-deduction is not permissible.  *In re Dumas*, 608 B.R. 902, 921 (Bankr. N.D. Ga. 2019) (noting that priority claims may be deducted "once, no more, no less.").  As a result, the Court finds that inclusion of the fees in both sections 3A and 3B of the Plan would result in double-counting the fees and that such double-counting is impermissible because it dilutes the funds available for unsecured non-priority creditors.

Next, the Trustee takes issue with the Debtors' decision to trade in their paid-off 2017 Chevy Tahoe to finance and purchase a 2022 Chevy Tahoe with a monthly payment of $528.21, which has the effect of reducing dollar-for-dollar the Debtors' payment obligation in this case at the expense of repaying their unsecured creditors.  The Debtors argue the car purchase was not made in bad faith, citing to *In re Wolf*, Case No. 13-13174-BFK, Doc. No. 17, arguing that the car was not purchased on the eve of bankruptcy, that the Debtors did not consult with counsel about buying the car, that the Plan contains a significant amount of money and that there is nothing to suggest that the debtors were loading up on debt in anticipation

of a bankruptcy filing.  The Debtors also cite to *In re Christians*, No. 12-00819-8-SWH, 2012 WL 4846538, at *4 (Bankr. E.D.N.C. Oct. 10, 2012), for the proposition that the car purchase in this case does not constitute bad faith.  Debtors also assert that the issue of this car purchase was decided in favor of the Debtors when the Court denied the Trustee's Motion to Dismiss.  The Court begins by noting that when the Motion to Dismiss was denied, the Debtors' income situation was not fully presented.  The Court's decision at that time did not take into account that the Debtors had been making repeated 401K withdrawals beyond the $30,000 withdrawal (including additional post-petition withdrawals) to make ends meet.  As a result of that new evidence and given that this Court is tasked with evaluating good faith based on the totality of the circumstances, the Court will not simply rubber stamp its prior decision regarding the good or bad faith surrounding the truck purchase.

In the *Wolf* case, the debtor traded in a 2005 Ford Mustang owned free and clear, for a Ford Focus that required a monthly payment of $419.39.  The Mustang was a "gas guzzler" and had much higher insurance premiums than the Focus.  The Mustang was seven years old and would have likely required substantial repairs during the life of the debtor's five-year plan.  In that case, Judge Kenney held that the debtor was not guilty of bad faith conduct.  In *Christians*, a chapter 7 abuse case, the debtor was recently separated from his spouse and needed transportation to get to work, so he bought a new $26,000 truck, thereby incurring a monthly payment of $499, and insurance premiums of $125 per month.  The debtor in that case failed to present any evidence that he was unable to secure a less-expensive vehicle.  The *Christians* court noted that its debtor made the purchase less than one month prior to his bankruptcy filing when he knew his financial situation was precarious and had already spoken with a bankruptcy attorney.  The *Christians* court was analyzing the truck purchase in the context of a multi-factor test to determine whether the case was an abusive chapter 7 filing.  One of the factors it considered was whether a debtor made purchases beyond his ability to pay.  The court found that the debtor's truck purchase weighed in favor of a finding of abuse.  *In re Christians*, No. 12-00819-8-SWH, 2012 WL 4846538, at *4 (Bankr. E.D.N.C. Oct. 10, 2012).

In the case at bar, the Debtors also traded in a car owned free and clear, bought a newer version of that same car, worth $75,000, and incurred a $528 monthly payment.[35]  The Debtors stuck with the same make and model of vehicle, except that the car they purchased was brand new.  At the time of the new purchase, the trade-in Tahoe was approximately five years old.  There is no evidence before the Court that the older Tahoe was a gas guzzler or that the new Tahoe is more gas efficient.  There is no evidence that the insurance premiums for the older car were higher or lower than the premiums for the new vehicle.  There is also no evidence before the Court that the car that was traded in was in a state of disrepair.  Indeed, the Debtors received $41,000 in trade-in value for the older Tahoe.  Moreover, there is no evidence before the Court that the Debtors were unable to secure a less-expensive vehicle.  They acknowledged at the hearing that they bought the new car because it was a good deal and because they wanted to avoid maintenance costs going forward.[36]

The Court cannot say that the car was purchased on the eve of bankruptcy, as it was purchased approximately five months before this case was filed and there is no evidence that the Debtors spoke with a bankruptcy attorney prior to the purchase.  However, the Court does have evidence before it that the Debtors were already in financial distress during that time because they had already been making withdrawals from their 401K accounts to make ends meet.  Further, the Court finds it suspect that the Debtors would be concerned with maintenance costs for the 2017 Tahoe when they have presented no evidence of any maintenance or repair costs for the car, when the trade-in credit they received was $41,000, and where they chose to buy a newer version of the same exact vehicle.  The Debtors knew they were already unable to make ends meet, and when they bought this car, they knew they were adding $528 in monthly payments to a budget that the evidence shows required them to drain their 401K accounts to survive.  Moreover, the Court is troubled by the fact that the Debtors borrowed nearly $17,000 from Upstart Network, Inc. a mere 17 days before paying their attorney to file this case. Incurring debt so close to filing bankruptcy certainly leads to the appearance that the Debtors were loading up on debt on the eve of filing.

---

[35] Doc. No. 1, p. 19.
[36] Transcript 36:6; 38:16-17.

Based on the totality of the circumstances, the Court finds that the act of purchasing the new Tahoe and the act of borrowing an additional $17,000 just days before paying their attorney to file this case are indicative of bad faith on the part of the Debtors.

The Trustee next objects to confirmation based on the liquidation test, arguing that the Plan fails to fully provide for the joint-tax liability in this case when it would otherwise be paid in full in a chapter 7 liquidation. The Debtors respond that the Plan proposes to pay in full the tax debt for which claims have been filed, regardless of what Schedule E/F indicates. Section 1325(a)(4) of the Bankruptcy Code requires that unsecured creditors in a chapter 13 case be paid at least as much as they would receive in a chapter 7 liquidation. Upon review of the Plan, the Court finds that it does not provide for the full joint tax liability. The IRS has filed Proof of Claim 4 in the amount of $30,531.21, of which $29,354.03 is priority.[37] That leaves $1,177.18 of unsecured joint tax debt. The Plan fails to separately classify the unsecured non-priority portion of the debt and provide for its full payment, as it would otherwise be paid in a chapter 7 liquidation, and as a result, the Plan fails to meet the liquidation test.

The Court now turns to the Trustee's objection based on the Debtors having partially paid their legal fees for this case by charging them on a credit card that they now seek to compromise through the Plan. The Debtors respond to this objection by admitting that they paid their counsel with a credit card. The Court has before it a situation where the Debtors charged their legal fees on a credit card when they knew they would be filing for bankruptcy and that they would be compromising any claim that would be filed in respect of the card at issue. In other words, on the eve of filing this petition, the Debtors incurred a debt that they did not intend to fully repay. Indeed, the Plan proposes a dividend of 73% to unsecured creditors. The previous plans proposed even less, with the first plan proposing a 53% dividend, the second plan proposing a 62% dividend, and the third plan proposing a 60% dividend. On these facts, the Court finds the Debtors knowingly incurred a debt that they not only could not pay, but that they had no intention of fully paying. The Court finds this is further evidence of the Debtors' bad faith in this case.

---

[37] Proof of Claim 4.

The Trustee next objects because the Debtors' schedules and Form 122 C-1 flip Debtor 1 and Debtor 2's financial information, creating confusion for purposes of review of the schedules and the means test.  The Court notes Ms. Machado is listed as Debtor 1 on the petition and on Form 122 C-1, that she is the higher earner and that her income is listed in the first and appropriate position on Form 122 C-1; however, she is listed as Debtor 2 on Schedule J.  The Debtors admit that this mistake occurred.  The Court also notes the error was previously brought to Debtors' counsel's attention more than once but was never corrected.[38]  While the uncorrected error has made the review of the Debtors' financial information more cumbersome, the Court does not find that this error is an indication of bad faith.

The Trustee also objects to the Debtors' failure to include in their means test calculation of current monthly income the $30,000 401K withdrawal made within the six months preceding the petition date.  The Debtors argue that the Supreme Court's decision in *Hamilton v. Lanning*, 560 U.S. 505 (2010) provides that such withdrawals need not be included in a debtor's projected disposable monthly income.  While *Lanning* may provide the Court with the ability to adjust projected disposable monthly income to account for changes in the Debtors' income or expenses that are known or virtually certain at the time of confirmation, the Court finds that the Debtors' argument misses the mark in that it ignores the requirement to first calculate the Debtors' current monthly income and their disposable monthly income prior to making any *Lanning* adjustments.

The Court begins by noting that Form 122C-1 instructs debtors to "Fill in the average monthly income that you received from all sources, derived during the 6 full months before you file this bankruptcy case." Line 9 of Form 122C-1 specifically inquires about pension or retirement income received by the debtor.  The Debtors indicated $0 dollars on this line despite withdrawing $30,000 from a 401K account in the six months prior to the petition date.  While it may be true that *Lanning* provides a mechanism by which the Court may adjust a debtor's projected disposable monthly income, that does not mean that these Debtors need not disclose 401K withdrawals made within the six-month period preceding the petition date in the

---

[38] Doc. Nos. 23 and 37.

calculation of their current monthly income.  *In re Mendelson*, 412 B.R. 75, 83 (Bankr. E.D.N.Y. 2009)

(singular distribution from a retirement account received within the six-month period prior to bankruptcy

should be included within "current monthly income," but should not be included in a debtor's "projected

disposable income"); *In re DeThample*, 390 B.R. 716, 721 (Bankr. D. Kan. 2008).[39]  The Court notes that

here, although the Debtors claimed the $30,000 was a one-time withdrawal, that assertion is belied by the

record.  The Debtors admit in their SOFA that they had taken withdrawals from their 401K accounts in the

three years preceding the bankruptcy filing. The Debtors' tax returns show that in tax-year 2022, in addition

to the $30,000 401K withdrawal, the Debtors withdrew an additional $23,379.[40]  Ms. Machado testified

during the hearing that the 401K withdrawals were made because the Debtors were still struggling.  The

Court notes that the case at bar is distinguishable from the *Mendelson* and *DeThample* cases where there

were no repeated retirement withdrawals.  Here, the Debtors not only made multiple withdrawals from their

401K accounts pre-petition (one of which was during the six-month lookback), but also continued to make

withdrawals post-petition.  In fact, both Debtors testified that they made additional withdrawals from their

respective 401Ks since the beginning of 2023. While it is true that the Debtors' Current Monthly Income

(CMI), less "amounts reasonably necessary to be expended" for the Debtors' support, is only the starting

point when calculating projected disposable monthly income, here, the Court cannot even get to the starting

point when the Debtors have not accurately disclosed all income on the means test.  The propriety of any

potential *Lanning* adjustment cannot be ascertained by the Court without first starting with an accurate

CMI.

Finally, the Trustee also asserts that the Plan is not feasible and that it is underfunded.  The Debtors

dispute both points.  The Court starts by noting that before they purchased the new Tahoe, the Debtors

already knew they were unable to make ends meet with their wages alone.  When they bought this vehicle,

they knew they were adding $528 in monthly payments to a budget that the evidence shows required the

---

[39] The Court notes that while these cases pre-date *Lanning*, they are consistent with the forward-looking *Lanning* approach to projected disposable monthly income.
[40] *See* Doc. No. 50, p. 2. (the "2022 Tax Returns").

Debtors to drain their 401K accounts to survive. In the first 8 months of the Plan, the Debtors have made 401K withdrawals in excess of $31,000 to meet their living expenses and make their plan payments to the Trustee. Given that the Debtors have virtually exhausted their retirement accounts and testified that they do not want to continue making withdrawals, the Court finds that feasibility is lacking with respect to the Plan. Since the Court finds that the Plan is infeasible at its current funding level, the Court need not address the Trustee's argument for a Plan with more funding.

### Conclusion

Ultimately, the Court finds that the Debtors have failed to properly calculate and commit the Debtors' projected disposable monthly income according to the means test and that the Plan fails the liquidation test and is infeasible. Based on the facts before it, the Court finds that under the totality of the circumstances, the Plan was not filed in good faith and demonstrates an abuse of the provisions, purpose, and spirit of chapter 13. For these reasons, the Court will deny confirmation of this Plan without leave to amend. A new plan will not cure the bad faith in this case, in particular the circumstances surrounding the purchase of the 2022 Tahoe, and the charging of the Debtor's legal fees. Nor are the Debtors capable of sustaining the Plan with their earned income alone. As a result, the case will be dismissed.

A separate Order will issue.

Dated: Jun 28 2023

/s/ Klinette H Kindred

Klinette H. Kindred
United States Bankruptcy Judge

**Copies mailed to:**

Entered On Docket: Jun 28 2023

Robert Sergio Brandt
*Counsel for Debtors*

Thomas P. Gorman
*Chapter 13 Trustee*